# MULLINS COAL CO., INC. OF VIRGINIA, ET AL. *v.* DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, ET AL.

No. 86–327.   Argued October 14, 1987—Decided December 14, 1987

STEVENS, J., delivered the opinion of the Court, in which, REHNQUIST, C. J., and WHITE, BLACKMUN, O'CONNOR, and SCALIA, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 161.

*Mark E. Solomons* argued the cause for petitioners. With him on the brief was *John D. Maddox*. *Michael K. Kellogg* argued the cause and filed briefs for the federal respondent in support of petitioners. On the briefs were *Solicitor General Fried, Deputy Solicitor General Ayer, Richard G. Taranto, George R. Salem, Allen H. Feldman,* and *Barbara J. Johnson*. *David Allen Barnette* filed a brief for Westmoreland Coal Co., respondent under this Court's Rule 19.6, in support of petitioners.

*C. Randall Lowe* argued the cause for respondents and filed a brief for respondent Ray. *S. Strother Smith III* filed a brief for respondent Stapleton.*

JUSTICE STEVENS delivered the opinion of the Court.

In 1978 the Secretary of Labor promulgated "interim regulations" to govern the processing of claims for black lung benefits filed between July 1, 1973, and April 1, 1980. See

---

*\*Grant Crandall, Michael H. Holland,* and *Patrick Nakamura* filed a brief for the United Mine Workers of America as *amicus curiae* urging affirmance.

*Robert F. Stauffer* filed a brief for the National Coal Association as *amicus curiae*.

20 CFR pt. 727 (1987). Section 203 of those regulations prescribes five ways in which a claimant may prove that he is entitled to an "interim presumption" of eligibility. The question in this case concerns the burden of proof that the claimant must satisfy to invoke the presumption. The Court of Appeals held, *Stapleton* v. *Westmoreland Coal Co.*, 785 F. 2d 424 (CA4 1986) (en banc), that a single item of qualifying evidence is always sufficient whereas the Secretary of Labor contends that his regulation requires the claimant to establish at least one of the five qualifying facts by a preponderance of the evidence. Because we are not persuaded that the Secretary has misread his own regulation, we reverse.

I

Although some aspects of the black lung benefits program are rather complex, its broad outlines and relevant statutory provisions can be briefly described. Prolonged exposure to coal dust has subjected hundreds of thousands of coal miners to pneumoconiosis — a serious and progressive pulmonary condition popularly known as "black lung." The tragic consequences of this crippling illness prompted Congress to authorize a special program for the benefit of its victims in 1969. Because that program has been developed through several statutory enactments,[1] different rules govern claims filed during different periods of time. Those filed prior to July 1, 1973, were processed by the Social Security Administration (SSA) pursuant to regulations promulgated by the Secretary of the Department of Health, Education, and Welfare

---

[1] Title IV of the Federal Coal Mine Health and Safety Act of 1969, 83 Stat. 792, 30 U. S. C. § 801 *et seq.*, was amended by the Black Lung Benefits Act of 1972, 86 Stat. 150, 30 U. S. C. § 901 *et seq.*, the Black Lung Benefits Revenue Act of 1977, 92 Stat. 11, the Black Lung Benefits Reform Act of 1977, 92 Stat. 95, the Black Lung Benefits Amendments of 1981, 95 Stat. 1643, the Black Lung Benefits Revenue Act of 1981, 95 Stat. 1635, and the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99–272, § 13203(a)(d), 100 Stat. 312, 313.

(HEW); when allowed, these "Part B" claims were paid from federal funds.[2] "Part C" claims[3] are those filed on or after July 1, 1973; they are paid by private employers or by a fund to which the employers contribute, and they are administered by the Director of the Office of Workers' Compensation Programs (the Director) pursuant to regulations promulgated by the Secretary of Labor (the Secretary). Part C of the program includes two subparts: claims filed after April 1, 1980, which are governed by "permanent criteria,"[4] and those filed prior to April 1, 1980, which are governed by the "interim regulations" at issue in this case. Despite the "interim" designation, these regulations are extremely important because they apply to about 10,000 pending claims.

There is no dispute about the Secretary's authority to promulgate the interim regulations.[5] Nor is there any suggestion that they violate any express statutory command. The statute does require the Secretary to establish criteria for eligibility that "shall not be more restrictive than" the criteria that the Secretary of HEW had established for the administration of the Part B program,[6] but the Court of Appeals did not hold that §203 violates this standard. The statute also requires that "all relevant evidence" shall be considered, but it is clear that the regulation is consistent with that requirement[7]—the only dispute is over how much of the

---

[2] Part B of the Act is codified at 30 U. S. C. §921 *et seq.*

[3] Part C is codified at 30 U. S. C. §931 *et seq.*

[4] See 20 CFR pt. 718 and §725.4(a) (1987).

[5] See 30 U. S. C. §902(f)(1). As the Court of Appeals noted:

"The statute . . . leaves to the Secretary how the presumption is to be triggered and rebutted and how the various burdens of persuasion and production are to be allocated between the claimant and the employer." *Stapleton* v. *Westmoreland Coal Co.*, 785 F. 2d 424, 433 (CA4 1986) (en banc).

[6] See 30 U. S. C. §902(f)(2).

[7] The statute provides, in part:

"In carrying out the provisions of this part, the Secretary shall to the maximum extent feasible (and consistent with the provisions of this part) utilize the personnel and procedures he uses in determining entitlement to

relevant evidence may be considered in determining whether the interim presumption shall be invoked. Thus, there is no need to parse statutory language to decide this case.

The Court of Appeals' holding rests, at bottom, on two propositions: (1) the regulation's plain language mandates that the presumption be invoked on the basis of a single item of qualifying evidence; and (2) the Secretary's reading is not faithful to the purposes of the program as reflected in its legislative history. We shall consider each of these propositions after reviewing the substance of the regulation and the facts of the one case that presents the legal question we must decide.[8]

---

disability insurance benefit payments under section 223 of the Social Security Act [42 U. S. C. § 423], but no claim for benefits under this part shall be denied solely on the basis of the results of a chest roentgenogram [X ray]. In determining the validity of claims under this part, *all relevant evidence shall be considered*, including, where relevant, medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials." § 923(b) (emphasis added).

The Court of Appeals was of the view that the regulation itself requires all relevant evidence to be considered on rebuttal, and that the Secretary's reading violated this requirement. See *infra*, at 149. To the extent that the presumption is made irrebuttable under the Secretary's reading, see *infra*, at 149–150, and n. 26, the court thought the statutory requirement that "all relevant evidence" shall be considered violated as well. See 785 F. 2d, at 434. This conclusion is clearly incorrect, for the same reasons that the court's conclusion regarding the regulation is incorrect. See *infra*, at 149–150. In short, the opportunity, under the Secretary's reading, to present relevant evidence at the invocation stage, satisfies the statutory requirement that "all relevant evidence" shall be considered.

[8] The resolution of the legal question apparently will not affect two of the individual respondents. Even though the Administrative Law Judge (ALJ) concluded that respondent Gerald R. Stapleton had properly invoked the interim presumption, he also concluded that it had been rebutted. The Court of Appeals majority agreed with that analysis, and the dissent, adopting the Secretary's approach, agreed with the result on the ground that the presumption should not have been invoked. For respondent

## II

Disability benefits are payable to a miner if (a) he or she is totally disabled, (b) the disability was caused, at least in part, by pneumoconiosis, and (c) the disability arose out of coal mine employment. All three of these conditions of eligibility are presumed if the claimant was engaged in coal mine employment for at least 10 years and if the claimant meets one of four medical requirements:[9] (1) a chest X ray establishes the presence of pneumoconiosis; (2) ventilatory studies establish the presence of a respiratory or pulmonary disease—not necessarily pneumoconiosis—of a specified severity; (3) blood gas studies demonstrate the presence of an impairment in the transfer of oxygen from the lungs to the blood; or (4) other

---

Glenn Cornett, the ALJ found that the presumption had been properly invoked and that it had not been rebutted. Both the majority and the dissent agreed with those conclusions. With respect to respondent Luke R. Ray, however, the majority disagreed with the ALJ's determination that the presumption had not been properly invoked, and remanded for a determination whether the presumption was rebutted. The dissent agreed with the ALJ, and would have affirmed the denial of benefits.

We think it helpful at this point to add a note about the posture of the parties to this case. The petitioners, who filed a joint petition pursuant to this Court's Rule 19.4, are Mullins Coal Co., the Old Republic Insurance Co., and Jewell Ridge Coal Corp. Mullins and Jewell Ridge employed, respectively, respondents Cornett and Ray, both of whom were victorious before the Court of Appeals, but only one of whom, Ray, has filed a brief in this Court. Old Republic is Mullins' black lung benefits insurance carrier. In addition to Cornett and Ray, respondents are: the Director, Office of Workers' Compensation Programs, who administers the Department of Labor's (Labor) black lung benefits program and whose brief lays out the Secretary's position challenging the Court of Appeals' conclusion regarding a claimant's invocation burden; Gerald R. Stapleton, whose benefits denial was affirmed by the Court of Appeals, see Stapleton v. Westmoreland Coal Co., supra, and who attacks that judgment as a respondent pursuant to Rule 19.6; and Westmoreland Coal Co., who employed Stapleton and is thus happy with the result below, but who is unhappy with the ramifications of the Court of Appeals' decision and has accordingly filed a brief in support of petitioners, also pursuant to Rule 19.6.

[9] A fifth alternative, available in a death benefit claim, is not at issue in this case. See 20 CFR § 727.203(a)(5) (1987), quoted in n. 10, infra.

medical evidence, including the documented opinion of a physician exercising reasonable medical judgment, establishes the presence of a totally disabling respiratory impairment.[10]

---

[10] The full text of § 727.203(a) reads as follows:

"(a) *Establishing interim presumption.* A miner who engaged in coal mine employment for at least 10 years will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of death, or death will be presumed to be due to pneumoconiosis, arising out of that employment, if one of the following medical requirements is met:

"(1) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428 of this title);

"(2) Ventilatory studies establish the presence of a chronic respiratory or pulmonary disease (which meets the requirements for duration in § 410.412(a)(2) of this title) as demonstrated by values which are equal to or less than the values specified in the following table:

|  | *Equal to or less than—* | |
| --- | --- | --- |
|  | *FEV* | *MVV* |
| 67″ or less | 2.3 | 92 |
| 68″ | 2.4 | 96 |
| 69″ | 2.4 | 96 |
| 70″ | 2.5 | 100 |
| 71″ | 2.6 | 104 |
| 72″ | 2.6 | 104 |
| 73″ or more | 2.7 | 108 |

"(3) Blood gas studies which demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood as indicated by values which are equal to or less than the values specified in the following table:

| *Arterial $pO_2$* | *Arterial $pCO_2$ equal to or less than (mm.Hg.)* |
| --- | --- |
| 30 or below | 70 |
| 31 | 69 |
| 32 | 68 |
| 33 | 67 |

It is noteworthy that only the first of the four alternative methods of invoking the presumption requires proof that the claimant's disease is in fact pneumoconiosis. None of the methods requires proof of causation, and only the fourth requires proof of total disability.

The second paragraph in the regulation describes how the presumption may be rebutted.[11] It first provides that in the adjudication of a claim, "all relevant medical evidence shall be considered." It then provides that the presumption is rebutted if the evidence establishes that the claimant is doing or is

| 34 | 66 |
|---|---|
| 35 | 65 |
| 36 | 64 |
| 37 | 63 |
| 38 | 62 |
| 39 | 61 |
| 40–45 | 60 |
| Above 45 | Any value. |

"(4) Other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment;

"(5) In the case of a deceased miner where no medical evidence is available, the affidavit of the survivor of such miner or other persons with knowledge of the miner's physical condition, demonstrates the presence of a totally disabling respiratory or pulmonary impairment."

[11] The full text of § 727.203(b) reads as follows:

"(b) *Rebuttal of interim presumption.* In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if:

"(1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

"(2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work (see § 410.412(a)(1) of this title); or

"(3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or

"(4) The evidence establishes that the miner does not, or did not, have pneumoconiosis."

capable of doing his usual or comparable work, that his disability did not arise, even in part, out of coal mine employment, or that he does not have pneumoconiosis. Thus, in order to rebut the interim presumption the employer has the burden of proving that at least one of the three conditions of eligibility is not satisfied.[12]

### III

Respondent Ray filed a claim for disability benefits with the Secretary in 1976. At the hearing before the ALJ, he proved that he had 16 years of coal mine employment. The ALJ placed 47 exhibits from the Director's file into evidence,[13] and the employer introduced four additional exhibits. The record contained one qualifying[14] X-ray interpretation, two qualifying ventilatory studies, and one qualifying physician's opinion. The record, however, also included seven

---

[12] Petitioners agree that the employer's rebuttal burden is one of proof as well as production. The Secretary also takes the position that the presumption should be invoked in cases of "true doubt"—that is, if the claimant's and employer's invocation evidence is of equal weight. Brief for Federal Respondent 33, 39. This position ensures that the employer will win, on invocation or rebuttal, only when its evidence is *stronger* than the claimant's. The Benefits Review Board (BRB) "has consistently upheld the principle that, where true doubt exists, that doubt shall be resolved in favor of the claimant." *Lessar* v. *C. F. & I. Steel Corp.*, 3 BLR 1–63, 1–68 (1981).

[13] Medical evidence is initially submitted to the Director by the claimant and the employer, and through examinations and tests ordered by the Director himself. See §§ 725.2(b) and 725.404 *et seq.* When a hearing is requested or ordered, all evidence previously submitted to the Director becomes part of the hearing record. See § 725.421(b)(4).

[14] The Court of Appeals used the term "qualifying" to refer to positive medical evidence that would suffice, absent contrary evidence of the same type, to invoke the presumption. For example, an X ray that disclosed pneumoconiosis (§ (a)(1)) or ventilatory studies that revealed a respiratory or pulmonary impairment of sufficient magnitude (§ (a)(2)) would constitute qualifying evidence. Conversely, negative X-ray results or ventilatory studies that failed to reveal a great enough impairment would be deemed "nonqualifying" evidence.

nonqualifying X-ray interpretations, four nonqualifying venti-
latory studies, and five nonqualifying physicians' opinions.[15]
After weighing the X-ray evidence, the ALJ concluded that
it did not establish that Ray had pneumoconiosis,[16] and after
balancing all the ventilatory studies, he concluded that they
did not establish the presence of a chronic respiratory or pul-
monary disease.[17]   Additionally, the ALJ found that the
other medical evidence, including documented physicians'
opinions, did not establish the presence of a totally disabling
respiratory or pulmonary impairment.[18]   He therefore held

[15] That Ray did not object to the nonqualifying evidence contained in
these exhibits is of no moment; what matters in this case is not *whether*
nonqualifying evidence may be introduced into the record (all parties agree
it may), but *when* that evidence may be considered.   During Ray's hear-
ing, the ALJ simply admitted all relevant evidence and took testimony.   It
was only in his written decision that the ALJ revealed whether he consid-
ered nonqualifying evidence during invocation or only on rebuttal.

[16] "I give greatest weight to the seven negative X-rays, three of which
were read by qualified 'B' readers.   (Dir. Exbs. 24, 25, 26)   I conclude
that the X-ray evidence does not establish that Claimant has pneumoconio-
sis.   20 CFR § 727.203(a)(1)."   App. to Pet. for Cert. 129a.

" 'B' readers are radiologists who have demonstrated their proficiency in
assessing and classifying X-ray evidence of pneumoconiosis by successful
completion of an examination conducted by or on behalf of the Department
of Health & Human Services."   *Consolidation Coal Co.* v. *Chubb*, 741 F.
2d 968, 971, n. 2 (CA7 1984).

[17] "The more recent ventilatory studies performed in 1977 and 1980 do
not demonstrate the presence of a chronic respiratory or pulmonary dis-
ease as defined by the aforementioned regulation.   (Dir. Exb. 19; Emp.
Exb. 1)   These findings are supported by earlier ventilatory studies in
1976 and 1975.   (Dir. Exbs. 16, 17)   I conclude that the weight of evidence
necessitates a finding that the ventilatory studies do not establish the pres-
ence of a chronic respiratory or pulmonary disease."   App. to Pet. for
Cert. 130a.

[18] "In light of the other medical opinions [not finding a totally disabling
respiratory or pulmonary impairment], I do not find Dr. Warden's opinion
of total disability, as a result of obstructive lung disease which is *probably*
related to dust exposure, persuasive.   Dr. Warden himself appears unsure
that exposure to coal dust caused the diagnosed lung disease."   *Id.*, at
132a–133a (emphasis in original).   We note that under § (a)(4) a qualifying

that Ray was not entitled to the benefit of the interim presumption.[19]

The BRB affirmed the ALJ's order denying benefits. It first noted that Ray's "contention that subsection (a)(1) must be invoked where the record contains a single positive X-ray has previously been considered and rejected,"[20] and it agreed with the ALJ's evaluation of the X-ray evidence and ventilatory studies. Finally, while disagreeing with some of the ALJ's reasoning, the Board reviewed and approved the ALJ's weighing of the physicians' opinions in the employer's favor.

The Court of Appeals remanded for further proceedings. It held that the interim presumption had been invoked under § (a)(2) by the two qualifying ventilatory studies and under § (a)(4) by the one qualifying physician's opinion. The court did not rely on the positive X-ray interpretation because it was not sufficiently identified to satisfy the requirements for X-ray evidence under § 718.102(c) of the Secretary's regulation. The court reversed the Board's denial of benefits and remanded for the ALJ to determine whether the presumption had been rebutted. We granted certiorari, 479 U. S. 1029 (1987), to resolve the question presented by this case: whether one item of qualifying evidence is always sufficient to invoke the interim presumption and thereby shift the burden of persuasion to the employer.

## IV

The Court of Appeals held that "the interim presumption under § 727.203(a)(1), (2), or (3) is established when there is

_____

physician's opinion need only conclude that the claimant has a totally disabling respiratory or pulmonary impairment, and need not also determine whether that impairment was caused by exposure to coal dust.

[19] The ALJ also considered three blood gas studies offered under § (a)(3), but none achieved the values necessary to qualify as proof of an impairment in the transfer of oxygen from the lung alveoli to the blood. Ray has not challenged these findings.

[20] Id., at 120a (citing Bozick v. Consolidation Coal Co., 5 BLR 1–574 (Ben. Rev. Bd. 1983)).

credible evidence that a qualifying X-ray indicates the presence of pneumoconiosis, a single qualifying set of ventilatory studies indicates, pursuant to the regulatory standard, a chronic respiratory or pulmonary disease, or a single qualifying set of blood gas studies indicates, pursuant to the regulatory standard, an impairment in the transfer of oxygen from the lungs to the blood." 785 F. 2d, at 426. The principal basis for this holding was the court's view that the plain language of the regulation makes it clear that a single positive X ray necessarily invokes the presumption. In advancing that view, however, the court did not pause to consider the significance of the word "establishes" in § (a)(1). It read § (a)(1) as though it merely required a chest X ray that constitutes evidence of the presence of pneumoconiosis rather than one that actually "establishes" the presence of the disease.

The Secretary's regulations, however, recognize the difference between an X ray that tends to prove the presence of pneumoconiosis and one that can be said to establish it. Thus, in contrast to the use of the word "establishes" throughout § 727.203(a), the regulation defining the suitable quality of X-ray evidence refers to an X ray that "shall constitute evidence of the presence or absence of pneumoconiosis."[21] The Court of Appeals read § 203(a)(1) as though it merely required an X ray that "constitutes evidence of the presence of pneumoconiosis." Had that been the Secretary's intent, presumably he would have used that language as he did elsewhere to explain that meaning.

There is another reason why § (a)(1) cannot have been intended to refer to a single item of evidence. For the ordinary trier of fact—even an ALJ who has heard many black lung benefit cases—an X ray may well be meaningless unless it is interpreted by a qualified expert. What may be persuasive to the ALJ, then, is not just the X ray itself, but its in-

---

[21] Section 718.102(e) (1987) provides, in part:

"(e) No chest X-ray shall constitute evidence of the presence or absence of pneumoconiosis unless it is in substantial compliance with the requirements of this section and Appendix A . . . ."

terpretation by a specialist. And, of course, different experts may provide different readings of the same X ray. As Judge Posner has observed:

> "Under the regulation it is not the reading, but the X-ray, that establishes the presumption. If one doctor interprets an X-ray as positive for black-lung disease but 100 equally qualified doctors interpret the same X-ray as negative for the disease, nothing in the regulation requires the administrative law judge to disregard the negative readings." *Cook* v. *Director, Office of Workers' Compensation Programs*, 816 F. 2d 1182, 1185 (CA7 1987).

Thus, it seems perfectly clear that it is not the X ray in isolation that "establishes" the presence of the disease; rather, the regulation must, at a minimum, have reference both to the X ray itself and to other evidence that sheds light on the meaning and significance of the X ray.[22] Just as the ALJ must weigh conflicting interpretations of the same X ray in

---

[22] The Court of Appeals' holding runs into trouble for § (a)(2) and § (a)(3) invocations as well. Those subsections refer to "ventilatory studies" and "blood gas studies"; facially, these plural references are not consistent with the Court of Appeals' reliance on the regulation's plain language. To finesse this problem, the Court of Appeals concluded that "one *set* of qualifying ventilatory or blood gas studies" necessarily invokes the presumption. 785 F. 2d, at 434 (emphasis added). It noted:

"[T]his interpretation is fully supported by the regulations which define how ventilatory and blood gas tests are to be conducted. These regulations demonstrate that each pulmonary function study consists of several tests and must be accompanied by two to three tracings of each test performed. 20 CFR §§ 718.103; 410.430. Similarly, a blood gas study may also have separate components, one reflecting the results obtained at rest, and the other reporting the results of testing during exercise. 20 CFR § 718.105." *Ibid.*

Nevertheless, this reasoning does rely upon adding the words "one set of" to the regulation; moreover, although ventilatory and blood gas studies do consist of a series of tests, the regulations on other occasions refer to such a series of tests as a single "study." See §§ 410.426(b) and 718.105(b) and (c).

order to determine whether it tends to prove or disprove the existence of pneumoconiosis, there would seem to be no reason why he must ignore all X rays in a series except one.[23]

The Court of Appeals relied in large part on perceived internal inconsistencies in the Secretary's interpretation. In the rebuttal section, the regulation provides that in "adjudicating a claim under this subpart, all relevant medical evidence shall be considered." The Court of Appeals interpreted this statement as requiring all relevant evidence to be considered on rebuttal. Since the Secretary's reading would make some evidence inadmissible for certain aspects of rebuttal,[24] the Court of Appeals thought that reading violated the requirement that "all relevant medical evidence shall be considered."

We disagree, for two reasons. First, nothing in the Secretary's position prevents "all relevant medical evidence" from being considered at some point during the proof process. To understand why this requirement was inserted at the beginning of the rebuttal section, it is important to understand its derivation. After the SSA adopted its interim presumption, its claims approval rate increased, in part due, it is thought, to factfinders failing to consider all of the employers' relevant medical evidence.[25] To assure that this problem would not infect adjudications under the new Labor interim presump-

---

[23] The ALJ's task is, of course, to weigh the quality, and not just the quantity, of the evidence, before determining whether the presumption has been invoked. In Ray's case, despite the fact that nonqualifying X rays and ventilatory studies, for example, significantly outnumbered qualifying ones, the ALJ's opinion focuses not on number, but on the uncertainty of the most recent qualifying X-ray interpretation and the discounting of one of the qualifying ventilatory studies by the doctor who administered them.

[24] E. g., negative X-ray interpretations that had already been outweighed by positive readings in establishing the existence of pneumoconiosis under § (a)(1) could not be used to show the absence of pneumoconiosis under § (b)(4). See n. 26, infra.

[25] See Solomons, A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of its Unresolved Issues, 83 W. Va. L. Rev. 869, 893–895 (1981) (Solomons).

tion, the requirement of 30 U. S. C. § 923(b) that all relevant medical evidence be considered in adjudicating SSA claims was explicitly carried over into the Labor presumption's rebuttal section. Thus, that the "all relevant medical evidence" requirement appears at the beginning of the rebuttal section reflects the genesis of the concern and does not indicate that the drafters intended a more limited evidentiary battle at the invocation stage. As long as relevant evidence will be considered at some point by the ALJ, the demand that the decision be made on the complete record is satisfied.

Second, the cited provision refers to "adjudicating a claim under this *subpart*," and a "subpart" "may be used to group related sections in a part." 1 CFR § 21.9(b) (1987). All of 20 CFR § 727.203 (1987), the interim presumption, is within *subpart* C of part 727. Thus, nothing in the regulation requires all relevant medical evidence to be considered at the rebuttal phase; such evidence must simply be admissible at some point during the proof process.

The Court of Appeals was persuaded as well that some of the rebuttal provisions would be superfluous under the Secretary's reading. For instance, if the claimant invokes the presumption by establishing the existence of pneumoconiosis under § (a)(1), the employer may not try to disprove pneumoconiosis under § (b)(4). This limitation on rebuttal, according to the Court of Appeals, renders the Secretary's position internally inconsistent.

Again, we are constrained to disagree. Nothing in the regulation *requires* each rebuttal subsection to be fully available in each case. As long as the employer can introduce, say, nonqualifying X rays at the invocation stage to oppose invocation under § (a)(1), it has been given the chance to show the nonexistence of pneumoconiosis. If the presumption is nonetheless invoked, the employer can still try to disprove total disability or causality.[26]

---

[26] Under the Secretary's reading, a fact established at the invocation stage *does* "remain open" to challenge on rebuttal, but "only to the extent there is relevant evidence different in kind from that offered at the pre-

Finally, there is some concern that the Secretary's position might permit a single negative X-ray interpretation to carry the day for the employer, in violation of the statute's mandate that "no claim for benefits . . . shall be denied solely on the basis of the results of [an X ray]." § 923(b) (made applicable to Part C adjudications through § 902(f)(2)). The easy answer was provided by the dissent below: "a single negative X-ray may not . . . be drawn upon either as the *sole* basis for finding the invocation burden under (a)(1) not carried nor as the *sole* basis for finding the rebuttal burden under (b)(4) carried." 785 F. 2d, at 445 (emphases added). Furthermore, in weighing conflicting X-ray readings ALJs will undoubtedly keep in mind the character of the black lung disease:

> "Since pneumoconiosis is a progressive and irreversible disease, early negative X-ray readings are not inconsistent with significantly later positive readings. . . . This proposition is not applicable where the factual pattern is reversed. In a situation . . . where the more recent X-ray evidence is negative and directly conflicting with

sumption stage." Brief for Federal Respondent 25. So, under the Secretary's reading, if the claimant invokes the presumption through "other medical evidence" under § (a)(4), thus proving the ultimate fact of total disability, the employer not only may attempt to disprove causality under § (b)(3) or pneumoconiosis under § (b)(4), but also may try to disprove total disability under § (b)(1) or § (b)(2) through evidence that was not able to be introduced at the invocation stage. However, as the Government also notes:

"Based on current medical knowledge, X-ray, biopsy, and autopsy evidence are today the only reliable evidence for diagnosing pneumoconiosis. Therefore, after a Subsection (a)(1) invocation, the question of pneumoconiosis is effectively closed: the rebutting party cannot, as a practical matter, attempt to show that the miner does not suffer from some form of clinical pneumoconiosis." *Id.*, at 24, n. 22.

Invocation under § (a)(2) or § (a)(3), of course, involves proof of none of the three ultimate facts of pneumoconiosis, total disability, or coal mine relatedness; thus, under the Secretary's interpretation, after a § (a)(2) or § (a) (3) invocation, the employer may attempt to disprove any of the three ultimate facts, limited only by the general rule that its proof may not include evidence of the sort introduced (and outweighed) during invocation.

earlier positive X-rays it may be weighed with less regard to timing in light of the recognized principle that negative X-ray readings are not a trustworthy indicator of the absence of the disease." *Elkins* v. *Beth-Elkhorn Corp.*, 2 BLR 1–683, 1–686 (Ben. Rev. Bd. 1979).

In sum, we find the Secretary's interpretation of his own regulation entirely consistent with its text.

## V

The Court of Appeals' holding that a single item of qualifying evidence always suffices to carry a claimant's invocation burden was based in part on its understanding of the legislative history of the black lung benefits statutes. 785 F. 2d, at 457–461. This conclusion is based on the clear congressional mandate for interim presumptions to reduce the number of benefit denials by both the SSA and Labor. While we agree that Congress did intend to ensure fewer benefit denials, we are not persuaded either that that goal has been frustrated by the Secretary's interpretation of the regulation, or that Congress intended more specifically to require invocation of the presumption based solely on one item of a claimant's proof.

In the early years of the benefits program, the SSA denied a high number of claims because of a perceived lack of proof of totally disabling pneumoconiosis due to coal mine employment. Congress mandated liberalized standards, and the SSA established an interim presumption to carry out this directive. § 410.490(b). In so doing, the SSA explained the problems with the prior scheme and the virtues of the new one:

"In enacting the Black Lung Act of 1972, the Congress noted that adjudication of the large backlog of claims generated by the earlier law could not await the establishment of facilities and development of medical tests not presently available to evaluate disability due to

pneumoconiosis, and that such claims must be handled under present circumstances in the light of limited medical resources and techniques. Accordingly, the Congress stated its expectancy that the Secretary would adopt such interim evidentiary rules and disability evaluation criteria as would permit prompt and vigorous processing of the large backlog of claims consistent with the language and intent of the 1972 amendments and that such rules and criteria would give full consideration to the combined employment handicap of disease and age and provide for the adjudication of claims on the basis of medical evidence other than physical performance tests when it is not feasible to provide such tests. The provisions of this section establish such interim evidentiary rules and criteria. They take full account of the congressional expectation that in many instances it is not feasible to require extensive pulmonary function testing to measure the total extent of an individual's breathing impairment, and that an impairment in the transfer of oxygen from the lung alveoli to cellular level can exist in an individual even though his chest roentgenogram (X-ray) or ventilatory function tests are normal." § 410.490(a).

The SSA implemented this congressional desire to ease claimants' proof burdens by promulgating the interim presumption that serves as the antecedent to the one at issue in this case. The presumption, applicable to claims filed with the SSA before July 1, 1973, provides that a miner is presumed to be totally disabled due to pneumoconiosis if two conditions are met: First, either "[a] chest . . . X-ray . . . establishes the existence of pneumoconiosis" or "[i]n the case of a miner employed for at least 15 years in underground or comparable coal mine employment, ventilatory studies establish the presence of a chronic respiratory or pulmonary disease . . . ." § 410.490(b)(1); second, "[t]he impairment established in accordance with [either of these medical require-

ments] arose out of coal mine employment." § 410.490(b)(2). Additionally, "a miner who meets the [ventilatory studies] medical requirements . . . will be presumed to be totally disabled due to pneumoconiosis arising out of coal mine employment . . . if he has at least 10 years of the requisite coal mine employment." § 410.490(b)(3).

The SSA's interim rules further provide that the presumption can be rebutted if either "[t]here is evidence that the individual is, in fact, doing his usual coal mine work or comparable and gainful work" or "[o]ther evidence, including physical performance tests . . . , establish[es] that the individual is able to do his usual coal mine work or comparable and gainful work." § 410.490(c).

As the SSA's claims approval rate increased, Labor's remained low, in large part because of the absence of an interim presumption by which a claimant would only have to prove one predicate fact. The interim presumption at issue in this case, promulgated as a result of congressional dissatisfaction with Labor's low claims approval rate, is substantially similar to the SSA interim presumption. It satisfies Congress' demand that Labor's criteria "shall not be more restrictive than the criteria applicable to a claim filed on June 30, 1973," 30 U. S. C. § 902(f)(2), i. e., no more restrictive than the SSA's interim presumption.

Since Labor's interim presumption derived so directly from the SSA's, if the Court of Appeals' conclusion regarding single-item invocation were correct, one would expect to find SSA ALJ decisions permitting invocation in such a manner, and federal court opinions indicating approval. Instead, federal court decisions routinely referred to SSA ALJ invocation weighings without objection, and often with explicit approval.[27] Thus,

---

[27] See, e. g., Padavich v. Mathews, 561 F. 2d 142, 145–146 (CA8 1977) (medical evidence "contradictory and inconclusive"; first set of X rays negative, second set first interpreted positive, then negative by different radiologists); Bozwich v. Mathews, 558 F. 2d 475 (CA8 1977) (conflicting X-ray readings; interim presumption not invoked); Collins v. Mathews, 547 F. 2d

the legislative history of the Labor interim presumption does not establish that invocation must occur on a single piece of qualifying evidence.[28]

---

795, 796 (CA4 1976) ("Although there were conflicting interpretations of [the] X-rays, the [ALJ] determined the deceased coal miner had simple pneumoconiosis"); *Petrock* v. *Califano*, 444 F. Supp. 872, 875 (ED Pa. 1977); *Owens* v. *Mathews*, 435 F. Supp. 200, 206 (ND Ind. 1977); *Hill* v. *Weinberger*, 430 F. Supp. 332, 334 (ED Tenn. 1976) ("[T]he Appeals Council stated . . . that it considers the interpretive opinions of all film readers, and bases its judgment with respect to a particular X-ray upon the credibility of the film readers . . ."); *Padavich* v. *Mathews*, 416 F. Supp. 1229, 1231 (SD Iowa 1976), aff'd, 561 F. 2d 142 (CA8 1977); *Ward* v. *Mathews*, 403 F. Supp. 95, 98 (ED Tenn. 1975); *Zirkle* v. *Weinberger*, 401 F. Supp. 945, 949 (ND W. Va. 1975); *Blackmon* v. *Weinberger*, 400 F. Supp. 1282, 1287 (ED Okla. 1975); *Baker* v. *Secretary of Health, Education, and Welfare*, 383 F. Supp. 1095, 1099 (WD Va. 1974).

Since the promulgation of the Labor interim presumption, the Courts of Appeals have been nearly as uniform in sanctioning invocation weighing under the SSA interim presumption. See, *e. g.*, *Hamrick* v. *Schweiker*, 679 F. 2d 1078, 1081 (CA4 1982); *Prater* v. *Harris*, 620 F. 2d 1074, 1084 (CA4 1980); *Pannell* v. *Califano*, 614 F. 2d 391, 393 (CA4 1980); *Staten* v. *Califano*, 598 F. 2d 328, 330 (CA4 1979); *Vintson* v. *Califano*, 592 F. 2d 1353, 1360 (CA5 1979); *Sharpless* v. *Califano*, 585 F. 2d 664, 667 (CA4 1978); *Gober* v. *Matthews*, 574 F. 2d 772, 775 (CA3 1978).

The Sixth Circuit stands alone in its view that if a claimant's first X-ray reading is positive, it necessarily invokes the presumption and may not be reread or contradicted by later readings or X rays, but that "when positive readings are contradicted by *prior* negative X-rays, there is substantial evidence to support a finding by the Secretary that the evidence is in conflict and the Secretary may have the positive X-rays reread in order to determine whether a claimant is disabled due to pneumoconiosis." *Couch* v. *Secretary of Health and Human Services*, 774 F. 2d 163, 168 (1985) (emphasis added); see also *Hatfield* v. *Secretary of Health and Human Services*, 743 F. 2d 1150 (1984); *Haywood* v. *Secretary of Health and Human Services*, 699 F. 2d 277 (1983); *Lawson* v. *Secretary of Health and Human Services*, 688 F. 2d 436 (1982); *Miniard* v. *Califano*, 618 F. 2d 405 (1980); *Dickson* v. *Califano*, 590 F. 2d 616 (1978).

[28] The Court of Appeals also relied upon evidence that an early draft of the regulation contained a provision that "would have required the adjudicator to weigh all the medical test evidence to determine whether the weight of this evidence established total disability." See Solomons 897,

## VI

Under either the Court of Appeals' or the Secretary's interpretation of the regulation, a single item of qualifying evidence *may* be sufficient to invoke the presumption. Indeed, the authors of the regulation apparently expected that the presumption would regularly be invoked on the basis of a single item of qualifying evidence.[29] Reasoning from that

---

n. 138. This provision was eliminated in response to objections raised by congressional staff members. The Court of Appeals concluded that this history demonstrates that the final draft of the regulation was not intended to require the weighing of any evidence before the presumption may be invoked. See 785 F. 2d, at 451–452, and n. 5. We are not persuaded. First, the regulation quite plainly does not require proof of total disability in order to invoke the presumption under §§ (a)(1), (a)(2), or (a)(3). Second, the rejected provision would have required, in determining total disability, a weighing of *"all* the medical *test* evidence"—*i. e.*, X rays, ventilatory studies, and blood gas studies. This *method* of invocation appears simply to have been scrapped in favor of permitting a claimant to meet *one* of the enumerated medical requirements.

[29] In responding to comments received after the notice of proposed rulemaking urging that all relevant evidence *not* be considered in rebutting the interim presumption, the Secretary stressed the statutory mandate requiring the evaluation of all relevant evidence. He explained:

"[T]he Department cannot, as has been requested by some, look for the single item of evidence which would qualify a claimant on the basis of the interim presumption, and ignore other previously obtained evidence. This does not mean that the single item of evidence which establishes the presumption is overcome by a single item of evidence which rebuts the presumption. The Act embodies the principle that doubt is to be resolved in favor of the claimant, and that principle plays an important role in claims determinations both under the interim presumption and otherwise." 43 Fed. Reg. 36826 (1978).

The Court of Appeals interpreted this statement as "clearly imply[ing] that it was intended that one item of qualifying evidence would be sufficient to invoke the presumption." 785 F. 2d, at 465. That is, the Court of Appeals read "the single item of evidence which would qualify a claimant on the basis of the interim presumption" and "the single item of evidence which establishes the presumption" as referring to a separate, unspoken,

expectation, the Court of Appeals concluded that the presumption *must* be invoked whenever the record contains a single item of qualifying evidence. But as we have demonstrated above, that conclusion is compelled by neither the text nor the history of the regulation.

Nor is it compelled by the underlying basis for the presumption. For black lung benefits presumptions, no less than any presumption established or recognized in law, are the product of both factual understandings and policy concerns. As a matter of fact, Congress could reasonably have concluded that it is highly probable that a person who engaged in coal mine employment for over a decade is totally disabled as a result of pneumoconiosis arising from that employment if he or she can prove any of the medical requirements specified in the regulation.[30] That degree of probabil-

---

and uncontroverted proposition that a single item of qualifying evidence *necessarily* satisfies the claimant's invocation burden. *Ibid.*

While this reading is plausible, we think it ultimately unsatisfactory. According to the Secretary, the first sentence of his explanation merely proscribes Labor from making "the presumption irrebuttable by singling out certain positive evidence and overlooking other relevant evidence." Brief for Federal Respondent 38. This reading focuses on the phrase "the Department cannot . . . look for"; rather than operating as a referent to an assumed invocation phase principle, the "single item of evidence . . ." phrase instead names the thing that Labor may not do, viz., pick and choose among the items of evidence in adjudicating a miner's claim. Thus, the second sentence of the explanation merely recognizes that in some cases the presumption *may* be invoked by a single item of evidence and that in such cases a single item of equally probative contrary evidence will not be sufficient to rebut the presumption.

[30] Like all rules of evidence that permit the inference of an ultimate fact from a predicate one, black lung benefits presumptions rest on a judgment that the relationship between the ultimate and the predicate facts has a basis in the logic of common understanding.

"Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime—that is, an 'ultimate' or 'elemental' fact—from the existence of one or more 'evidentiary' or 'basic'

ity is not, however, present when the claimant is merely in a position to offer a single item of qualifying evidence that is overcome by more reliable conflicting evidence.

As a matter of policy, Congress was aware that it is difficult for coal miners whose health has been impaired by the insidious effects of their work environment to prove that their diseases are totally disabling and coal mine related, or that those diseases are in fact pneumoconiosis. Rather than merely providing a benefit for those miners who could prove each of the relevant facts by a preponderance of the evidence, Congress intended that those long-term miners who can show that they are truly diseased should have to prove no more.[31] But if a miner is not actually suffering from the type of ailment with which Congress was concerned, there is no justification for presuming that that miner is entitled to benefits. For not only does that miner fall outside the class of those who need the assistance of an interim presumption, but he also is unlikely to be totally disabled from coal mine employment. By requiring miners to show that they suffer from the sort of medical impairment that initially gave rise to congressional concern, and then by requiring employers to shoulder the remainder of the proof burden, the Secretary's

---

facts . . . . The value of these evidentiary devices, and their validity under the Due Process Clause, vary from case to case, however, depending on the strength of the connection between the particular basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently." *Ulster County Court* v. *Allen,* 442 U. S. 140, 156 (1979).

[31] The statute itself, of course, requires certain presumptions for pre-July 1, 1973, SSA claims. For example, the statute presumes a miner's pneumoconiosis to have arisen out of coal mine employment if he has worked for 10 or more years in one or more coal mines. 30 U. S. C. § 921(c)(1); see also §§ 921(c)(2), (3), and (4) (other SSA claim presumptions). Since Labor's interim presumption may be no less restrictive than the SSA's, these § 921(c) presumptions apply indirectly to Labor claims as well.

reading of the interim presumption's invocation burden satisfies both the purposes of the statute and the need for a logical connection between the proven fact and the presumed conclusion.[32]

In the end, the Secretary's view is not only eminently reasonable but also is strongly supported by the fact that Labor wrote the regulation. The agency's interpretation, which is deserving of substantial deference "unless it is plainly erroneous or inconsistent with the regulation," *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410, 414 (1945), has been, with one exception, consistently maintained through Board decisions.[33] Likewise, prior to the Court of Appeals decision in this case, the Courts of Appeals had routinely reviewed for substantial evidence the factfinder's invocation determination under a preponderance-of-the-evidence standard.[34] Accord-

---

[32] Lurking beneath the surface of this case is the constitutional concern that there be "some rational connection between the fact proved and the ultimate fact presumed." *Mobile, J. & K. C. R. Co.* v. *Turnipseed*, 219 U. S. 35, 43 (1910). There is some question whether pneumoconiosis, for example, can be considered "proved"—and therefore serve as the constitutional predicate for presuming ultimate facts—if evidence tending to disprove pneumoconiosis is not permitted to be considered at invocation. See *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 28–29 (1976) (statutory presumption of causation, 30 U. S. C. § 921(c)(1), is triggered only on "proof of pneumoconiosis" plus 10 years' employment).

[33] See, *e. g.*, *Elkins* v. *Beth-Elkhorn Corp.*, 2 BLR 1–683, 1–686—1–687 (Ben. Rev. Bd. 1979) (approving weighing of X-ray evidence under § (a)(1)); *Strako* v. *Zeigler Coal Co.*, 3 BLR 1–136, 1–143 (Ben. Rev. Bd. 1981) (factfinder "must weigh conforming qualifying test reports with conforming nonqualifying test reports, and he must resolve the conflict," under § (a)(2)); *Lessar* v. *C. F. & I. Steel Corp.*, 3 BLR, at 1–68 (requiring weighing of § (a)(3) evidence); *Meadows* v. *Westmoreland Coal Co.*, 6 BLR 1–773, 1–779 (Ben. Rev. Bd. 1984) (approving weighing of conflicting medical reports under § (a)(4)), overruling *Stiner* v. *Bethlehem Mines Corp.*, 3 BLR 1–487, 1–490 (Ben. Rev. Bd. 1981) (requiring invocation on basis of one qualifying medical opinion).

[34] See, *e. g.*, *Moseley* v. *Peabody Coal Co.*, 769 F. 2d 357, 359–360, and n. 3 (CA6 1985) (approving ALJ's weighing of X-ray interpretations before

ingly, there is no reason to downgrade the normal deference accorded to an agency's interpretation of its own regulation. Cf. *Motor Vehicle Mfrs. Assn. of the United States, Inc.* v. *State Farm Mutual Automobile Insurance Co.*, 463 U. S. 29 (1983).

---

holding presumption invoked under § (a)(1)); *Consolidation Coal Co.* v. *Chubb*, 741 F. 2d, at 973 (approving ALJ's "according greater weight to the recent X-ray"); *Drummond Coal Co.* v. *Freeman*, 733 F. 2d 1523 (CA11 1984) (not objecting to ALJ's invocation after weighing evidence under §§ (a)(1), (2), and (4)); *Whicker* v. *United States Dept. of Labor Benefits Review Bd.*, 733 F. 2d 346 (CA4 1984) (sanctioning § (a)(1) weighing), overruled, *Stapleton* v. *Westmoreland Coal Co.*, 785 F. 2d 424 (CA4 1986); *Consolidation Coal Co.* v. *Sanati*, 713 F. 2d 480 (CA4 1983) (requiring weighing of physicians' opinions under § (a)(4)), overruled in part, *Stapleton* v. *Westmoreland Coal Co.*, *supra; Markus* v. *Old Ben Coal Co.*, 712 F. 2d 322, 324 (CA7 1983) (approving ALJ's accepting more recent negative X-ray interpretations over older positive ones).

After the Court of Appeals decision in this case, the Courts of Appeals have adopted divergent views on the issue presented. The Third Circuit is the only one to have plainly sided with the Fourth. *Revak* v. *National Mines Corp.*, 808 F. 2d 996 (1986). With some intracircuit confusion, the Sixth and Seventh Circuits have followed the Secretary's interpretation. *Prater* v. *Hite Preparation Co.*, 829 F. 2d 1363 (CA6 1987) (preponderance standard for §§ (a)(1), (2), and (3) invocations); *Patton* v. *National Mines Corp.*, 825 F. 2d 1035 (CA6 1987) (remand to Board to determine whether preponderance standard is correct for § (a)(4) invocations); *Back* v. *Director, Office of Workers' Compensation Programs*, 796 F. 2d 169 (CA6 1986) (preponderance standard for § (a)(1) invocations); *Engle* v. *Director, Office of Workers' Compensation Programs*, 792 F. 2d 63, 64, n. 1 (CA6 1986) ("The miner has the burden of establishing by a preponderance of the evidence all the facts necessary to invoke the interim presumption of 20 CFR § 727.203(a) . . ."); *Cook* v. *Director, Office of Workers' Compensation Programs*, 816 F. 2d 1182 (CA7 1987) (preponderance standard for § (a)(1) invocations) (*Amax Coal Co.* v. *Director, Office of Workers' Compensation Programs*, 801 F. 2d 958 (CA7 1986), and *Kuehner* v. *Ziegler Coal Co.*, 788 F. 2d 439 (CA7 1986), distinguished on ground that they merely held that invocation is *permitted* by one item of evidence; dissenting judge finds prior cases indistinguishable). The Tenth Circuit, without discussing the issue, simply approved an X-ray weighing that resulted in noninvocation. *Plutt* v. *Benefits Review Bd., Dept. of Labor*, 804 F. 2d 597 (1987).

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.[35]

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

This case concerns the evidentiary threshold that a claimant of black lung benefits must meet to invoke the interim presumption of total disability due to pneumoconiosis under 20 CFR § 727.203(a) (1987). The Director of the Office of Workers' Compensation (Director) interprets the regulation to require that a claimant prove by a preponderance of the evidence one of the four medical requirements listed in § 727.203(a) to trigger the presumption. The Court of Appeals, en banc, rejected the Director's proffered interpretation and held that the presumption is invoked once the claimant has presented a single item of evidence meeting one of the medical requirements—that is, "one positive x-ray, one qualifying set of ventilatory or blood gas studies, or one physician's opinion." *Stapleton* v. *Westmoreland Coal Co.*, 785 F. 2d 424, 436 (CA4 1986). The Court chooses to embrace the Director's view. Because I believe that the Director's interpretation of the regulation contravenes its plain language and creates a regulatory scheme that is unnecessarily complex and internally inconsistent, I dissent.

I

The language and structure of the regulation provide the most compelling evidence for rejecting the Director's interpretation. The regulation sets up two evidentiary stages:

---

[35] Because we agree with petitioners that the regulation itself requires a claimant to prove an invocation fact by a preponderance of the evidence, we need not pass on petitioners' alternative argument, namely, that § 7(c) of the Administrative Procedure Act, 5 U. S. C. § 556(d), requires a claimant to prove an invocation fact by a preponderance of the evidence.

part (a), the presumption-invocation stage, and part (b), the rebuttal stage. Part (a) provides that a "miner who engaged in coal mine employment for at least 10 years will be presumed to be totally disabled due to pneumoconiosis" as long as the miner meets any one of four medical requirements. § 727.203(a). Part (b) provides that the presumption is rebutted if the Administrative Law Judge (ALJ) determines that the claimant is doing or could do his usual coal mine work or comparable gainful work; that the disability "did not arise in whole or in part out of coal mine employment"; or that the "evidence establishes that the miner does not, or did not, have pneumoconiosis." § 727.203(b).

Under § (a)(1), the presumption is triggered when "[a] chest [X ray], biopsy, or autopsy establishes the existence of pneumoconiosis." Under § (a)(4), the presumption is triggered when "[o]ther medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment." The regulation does not refer to "the X-ray evidence taken as a whole," or "the weight of documented opinions of physicians"—the inquiry mandated by the Court's interpretation—but rather to *an* X ray, or *a* physician's opinion. Moreover, the regulation does not provide that a claimant who presents a single qualifying piece of evidence *may* be presumed to be totally disabled because of pneumoconiosis, but rather provides that such a claimant *"will* be presumed" totally disabled because of the disease. The regulation thus expressly commands that a single qualifying X ray or a single documented physician's opinion will trigger the presumption.[1]

---

[1] With respect to the medical requirements under §§ 727.203(a)(2) and (a)(3), the regulation uses the plural, referring to "ventilatory studies" and "blood gas studies." The use of the plural, however, only reflects the fact that a qualifying ventilatory and blood gas test consists of a set of many studies. See 20 CFR §§ 718.103, 718.105 (1987). As with § (a)(1) and § (a)(4), the presumption is triggered when a claimant presents a single set

The Court attempts to evade the plain meaning of the regulation by placing overriding emphasis on the regulation's use of the word "establishes." The Court interprets "establish" to mean that a claimant must prove each of the medical requirements by a preponderance of the evidence.[2] Under this interpretation, an ALJ must weigh conflicting like-kind evidence before invoking the presumption. A more natural reading of "establish" in the context of the presumption-invocation stage, however, is simply that the ALJ must determine whether a claimant has come forward with an X ray, a set of ventilatory or blood gas studies, or a physician's opinion that meets the requirements and standards of the regulation. In other words, an ALJ determines whether the single item of evidence "establishes the existence of pneumoconiosis" or "establishes the presence of a totally disabling respiratory or pulmonary impairment" by referring to the strict reliability and authenticity requirements of the regulations, see, e. g., 20 CFR §§ 410.428, 727.206 (1987), and, with regard to ventilatory and blood gas studies, to the qualifying standards set out in § 727.203(a).

The Court argues that § (a)(1) cannot have been intended to refer to a single item of evidence because an X ray is probative only when it is interpreted by a qualified expert. The Court reasons that because the presumption is invoked by an X ray, and not by an expert's reading, an ALJ may have to consider different interpretations of the same X ray. From this premise, the Court concludes that "[j]ust as the ALJ must weigh conflicting interpretations of the same X ray . . . , there would seem to be no reason why he must ignore

---

of ventilatory or blood gas studies that meet the qualifying standards set out in part (a).

[2] Both the Director and the Court state that the agency has "long adhered to the 'true doubt' rule, which requires that the claimant prevail on those issues as to which the evidence is in equipoise." Brief for Federal Respondent 16–17 (citation omitted). The Director has failed to bring to our attention, however, one instance in which the true-doubt rule actually has been applied by an ALJ in evaluating a miner's claim.

all X rays in a series except one." *Ante*, at 148–149 (foot-note omitted). No reason except the regulatory language. Whatever the merit of the Court's conclusion that conflicting readings of the same X ray must be weighed prior to invoking the presumption (for that question is not before the Court), the regulation's plain language requires that the presumption be invoked when a single X ray is read only as positive. In addition, contrary to the Court's characterization, additional X rays that indicate the absence of pneumoconiosis are not "ignored"; they are fully considered by the ALJ during the rebuttal stage, when all evidence against the presumed exist-ence of pneumoconiosis is brought to bear.[3]

The Court of Appeals ruling that a single qualifying test or medical opinion is sufficient to invoke the presumption is fur-ther supported by the comments that the Secretary of Labor issued in connection with the final promulgation of the regu-lations. In addressing the standard of rebuttal, the Secre-tary stated:

---

[3] The Court also argues that the Court of Appeals reads the invocation section "as though it merely required an X ray that 'constitutes evidence of the presence of pneumoconiosis,'" and asserts that "[h]ad that been the Secretary's intent, presumably he would have used that language as he did elsewhere to explain that meaning." *Ante*, at 147. The Court notes that § 718.102(e), a regulation defining standards required of X rays, refers to an X ray "that shall constitute evidence of the presence or absence of pneu-moconiosis." This argument arises from the Court's unwillingness to rec-ognize that the meaning of "establish" is informed by the requirements of the presumption-invocation stage. The Court is correct that in context of the presumption-invocation stage, a single item of evidence that "consti-tutes evidence of pneumoconiosis" will also "establish the existence of pneumoconiosis." Given that the inquiry at the invocation stage is whether a single item of evidence is qualifying, the functional equivalence of these two terms is to be expected. As for the regulation cited by the Court defining X-ray standards, it guides the evaluation of all claims for black lung benefits, not just claims that fall under the interim regulations. That these standards speak of X rays that "constitute evidence of pneumo-coniosis," rather than X rays that "establish the existence of pneumoconio-sis," says nothing about whether these two terms have identical meanings in the context of the presumption-invocation stage.

"[T]he Department cannot, as has been requested by some, look for the single item of evidence which would qualify a claimant on the basis of the interim presumption, and ignore other previously obtained evidence. This does not mean that *the single item of evidence which establishes the presumption* is overcome by a single item of evidence which rebuts the presumption." Notice of Final Rulemaking under the Black Lung Benefits Reform Act of 1977, 43 Fed. Reg. 36826 (1978) (hereinafter Notice of Rulemaking) (emphasis added).

The Director's current position conflicts with this strong evidence of regulatory intent.

Another compelling reason to reject the Director's interpretation is that it conflicts with the requirement in part (b), the rebuttal section, that in "adjudicating a claim under this subpart, all relevant medical evidence shall be considered." § 727.203(b). The Director's interpretation turns the regulation on its head, requiring that all relevant medical evidence be submitted and weighed at the invocation stage, but severely restricting the consideration of medical evidence during the rebuttal stage. In the Director's view, the presumption is triggered only when the weight of evidence in one of the categories of medical evidence in part (a) proves the fact specified in that category. For instance, the "fact proved" under § (a)(1) is the existence of pneumoconiosis, and under § (a)(4) it is the presence of a totally disabling respiratory or pulmonary impairment. Because these facts have been proved in the invocation stage, relitigation in the rebuttal stage through like-kind evidence is foreclosed. Brief for Federal Respondent 14–15. Of course, nonmedical evidence could be presented in these instances, but this hardly conforms to the mandate that "all relevant medical evidence" be considered in the rebuttal stage.

The Court argues that the placement of the "all relevant medical evidence" requirement was inexact, and that the regulation requires only that all relevant medical evidence be

considered at some point in the evaluation of a claim, whether it be during the invocation or rebuttal stage. Yet if the Secretary intended that the "all relevant medical evidence" language apply to both stages of the evaluation process, it is remarkable that he placed the language in the introduction to the rebuttal section. It would have been a simple matter, if such were the Secretary's intent, to place the "all relevant medical evidence" language at the beginning of § 727.200. I see no reason to assume such inartful drafting. Moreover, comments by the Secretary accompanying the final promulgation of the regulations conflict with the Court's interpretation. The Secretary stated: "The many comments which urge that all relevant evidence should not be considered *in rebutting the interim presumption* must also be rejected. . . . [T]he Social Security regulations . . . similarly do not limit the evidence which can be considered *in rebutting the interim presumption.*" Notice of Rulemaking 36826 (emphasis added). These comments demonstrate that the Secretary understood the language to apply directly to the rebuttal section.

In addition, the Director's approach renders virtually useless one of four grounds for rebuttal in part (b). Under § (b)(4), eligibility for benefits is rebutted if all relevant medical evidence establishes that the miner does not have pneumoconiosis. Yet in the Director's view all relevant medical evidence has already been considered at the presumption-invocation stage. It is only when the evidence presented during the invocation stage is mismatched, as for example when the claimant produces qualifying blood-gas-studies evidence and the mine operator produces negative X rays, that the presumption may be triggered and rebuttal evidence under § (b)(4) is available that has not already been weighed. Moreover, as the Director acknowledges, if a claimant invokes the presumption under § (a)(1) by a preponderance of X-ray, biopsy, or autopsy evidence, as a practical matter there is no further evidence that the coal mine operator could submit to rebut the presumed existence of pneumoconiosis

because such § (a)(1) evidence is the most reliable method of diagnosing the disease. See Brief for Federal Respondent 24, n. 22. The Court counters that "[n]othing in the regulation *requires* each rebuttal subsection to be fully available in each case." *Ante*, at 150. This is of course true. Yet it is extraordinary that the regulation would intend to make the rebuttal stage an often useless exercise with respect to the central aspect of a valid claim: whether a miner suffers from pneumoconiosis.

## II

In addition to running afoul of the regulatory language and structure, the Director's reading of the regulation creates a needlessly complex regulatory scheme that blurs the distinction between the presumption-invocation and rebuttal stages. Under the Director's interpretation, when the weight of evidence in one of the medical-evidence categories invokes the presumption, then the same evidence cannot be considered during rebuttal to challenge the existence of the fact proved, but it may be considered if relevant to rebut one of the presumed elements of a valid claim for benefits. The Director's approach subjects the ALJ to a mesmerizing swirl of evidentiary rules. If the presumption is invoked under § (a)(1), then X-ray evidence may not be considered regarding the existence of pneumoconiosis, but may be considered, if relevant, on the issues whether the miner is totally disabled or whether the disease arose from coal mine employment. Similarly, if the presumption is invoked under § (a)(4), then medical evidence, including physicians' opinions, may not be considered on the issue of total disability, although it may be considered on the issues of the existence of pneumoconiosis and causation by coal mine employment. Finally, if the presumption is invoked using blood gas and ventilatory studies evidence under § (a)(2) and § (a)(3), the same evidence may be considered again regarding each rebuttal category, because the proved facts are not elements of a valid claim for benefits. The Director's interpretation thus

creates a procedural morass that could not have been intended by the regulation's two-step inquiry.

By contrast, the Court of Appeals interpretation is marked by its simplicity. Under this approach the ALJ first determines whether the claimant has come forward with a qualifying medical test or physician's opinion and, if so, proceeds to the rebuttal stage. At this point all relevant evidence must be considered, and the mine operators may rebut the presumed existence of pneumoconiosis, total disability, and causation by coal mine employment on the basis of all the grounds provided by § 727.203(b).

## III

The Court's willingness to accept the Director's interpretation of the regulation is based, I believe, on a misperception of the problem Congress and the Department of Labor were trying to alleviate with the interim presumption. Pneumoconiosis is an elusive and progressive disease. Congress was deeply concerned about the difficulty of diagnosing pneumoconiosis and the dearth of medical-testing facilities available to miners. Testimony before congressional committees and by Members of Congress repeatedly emphasized the unreliability of negative test results. As this Court stated in *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1, 31–32, and n. 33 (1976), "Congress was presented with significant evidence demonstrating that X-ray testing that fails to disclose pneumoconiosis cannot be depended upon as a trustworthy indicator of the absence of the disease," whereas there was no "authoritative indications that X-ray evidence of the *presence* of pneumoconiosis is untrustworthy."[4] Juxtaposed with the difficulties in diagnosing pneumoconiosis was evi-

---

[4] For example, a study cited in a Senate Report found that "approximately 25 percent of a random sample of some 200 coal miners whose medical records based upon X-ray findings showed no coalworker's pneumoconiosis were found on post mortem examination to have the disease." S. Rep. No. 92–743, p. 12 (1972).

dence that the disease was rife among long-term coal miners. Congressman Paul Simon noted one study that found that autopsies of 400 coal miners with more than 20 years' experience showed that 90–95% of them had pneumoconiosis. House Committee on Education and Labor, Black Lung Benefits Reform Act and Black Lung Benefits Revenue Act of 1977, 96th Cong., 282–283 (Comm. Print 1979). Testimony before the Senate estimated that as many as 50% of all coal miners will eventually become disabled from pneumoconiosis. See Hearings on S. 355 et al. before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 91st Cong., 1st Sess., pt. 2, pp. 641, 856 (1969) (statements of Dr. I. E. Buff and Dr. Leon Cander).

The Court recognizes that Congress was especially concerned with the difficulties miners face in showing they suffer from pneumoconiosis. The Court reasons, however, that "Congress intended that those long-term miners who can show that they are truly diseased should have to prove no more. But if a miner is not actually suffering from the type of ailment with which Congress was concerned, there is no justification for presuming that that miner is entitled to benefits." *Ante*, at 158 (footnote omitted). Yet it is the difficulty in showing whether a miner is "truly diseased" that Congress found so troubling. No one disputes that the case file of a miner suffering from pneumoconiosis may include negative X rays, negative ventilatory studies, negative blood gas studies, and negative opinions by physicians. The interim presumption was designed to shift some of the risk of faulty test results from the miner to the employer. The evidence of high incidence of pneumoconiosis among long-term coal miners, coupled with the difficulties encountered in diagnosing the disease, gave the Department of Labor good reason for shifting this burden by presuming total disability due to pneumoconiosis based on findings of a single positive medical test or physician's opinion. The Director's current

interpretation, which the Court today accepts, undermines that policy decision.

## IV

The Court is correct that the agency's interpretation of its own regulations is entitled to deference. See, *e. g.*, *Bowles v. Seminole Rock & Sand Co.*, 325 U. S. 410, 414 (1945). But deference has its bounds. It is not a license for an agency effectively to rewrite a regulation through interpretation. An agency must abide by its regulations as written until it rescinds or amends them. See *United States* v. *Nixon*, 418 U. S. 683, 695–696 (1974). The Director's interpretation of the interim presumption is contrary to the plain language of the regulation, conflicts with comments of the Secretary accompanying the final promulgation of the regulation, and creates an unnecessarily complex regulatory scheme. Because I view the agency's interpretation as plainly inconsistent with the regulatory language and history, I would not defer.

I accordingly dissent, and would affirm the judgment of the Court of Appeals.